AO 106 (Rev. 04/10) Application for a Search Warrant                              AUTHORIZED AND APPROVED/DATE: _____

# UNITED STATES DISTRICT COURT
## for the
### Western District of Oklahoma

In the Matter of the Search of  )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )     Case No. MJ-25- 630- ALM
 )
Information associated with device assigned IMEI )
352756079862042 and or Mobile Directory Number )
(MDN) (657) 437-0711 )

FILED
OCT 31 2025
JOAN KANE, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY _____, DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and incorporated by reference.

located in the _____ District of ____New Jersey____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1153 & 81 | Arson in Indian Country |

The application is based on these facts:
See the Affidavit of Oklahoma State Bureau of Investigation (OSBI) Lieutenant David Gatlin, which is incorporated by reference herein.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

David Gatlin
_____
Applicant's signature

David Gatlin, OSBI, Lieutenant
Printed name and title

Sworn to before me and signed in my presence.

Date: 10/31/25

Amanda L. Maxfield
_____
Judge's signature

City and state: Oklahoma City, Oklahoma

Amanda L. Maxfield, U.S. Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, David Gatlin, a Lieutenant with the Oklahoma State Bureau of Investigation (OSBI), and a Special Deputy U.S. Marshal on the Federal Bureau of Investigation (FBI) Safe Trails Task Force, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this Affidavit in support of an application for a search warrant for information associated with International Mobile Equipment Identity (IMEI) 352756079862042 and/or Mobile Directory Number (MDN) (657) 437-0711 (hereinafter, the "**SUBJECT ACCOUNT**") that is in the custody or control of Verizon, a wireless communications service provider that accepts process at 180 Washington Valley Road, Bedminster, NJ. As a provider of wireless communications service, Verizon is a provider of "electronic communications service," as defined in 18 U.S.C. § 2510(15).

2. This affidavit is in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the disclosure of cellular telephone records as evidence of a violation of Title 18, United States Code, Sections 1153 and 81, Arson in Indian Country.

3. Your Affiant is David Gatlin, a certified and commissioned police officer in and for the State of Oklahoma, for approximately 18 years, and is currently employed as a Lieutenant for the Oklahoma State Bureau of Investigation (OSBI). Your Affiant was previously employed by the District 3 and District 6 Drug Task Forces. Your Affiant's training and education have included a Bachelor's Degree in Criminal Justice from the

University of Oklahoma, OSBI Agent's Academy, the Oklahoma Bureau of Narcotics Investigators Course, and the State of Oklahoma Basic Peace Officer Academy.

4. As a Special Deputy with the FBI Safe Trails Task Force, I am authorized to investigate violations of the laws of the United States that occur in Indian Country, including violations of Title 18, United States Code, Sections 1153 and 81, and to execute warrants issued under the authority of the United States.

5. The information to be searched is described in the following paragraphs and in Attachment A. This Affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require Verizon to disclose to the government the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate the items described in Section II of Attachment B.

6. In sum, this Affidavit is made in support of an application for an order for historical cell site data for the **SUBJECT ACCOUNT**, pursuant to 18 U.S.C. § 2703(d).

7. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a

district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE FACTS

9. On August 20, 2025, a resident (VI-1) of Washington, Oklahoma, discovered their vehicle had been broken into and items in the vehicle had been taken. After a review of a neighbor's surveillance videos, VI-1 discovered an individual walking around their property in the early morning hours. Additionally, VI-1 saw a white Ford Excursion driving around the neighborhood during the same period of time. At the time the suspect was at VI-1's residence, VI-1's vehicle was parked next to his Oklahoma City Police Department patrol vehicle. VI-1's residence is in the Western District of Oklahoma and within the boundaries of the Chickasaw Nation.

10. On August 21, 2025, at around 0539 hours, the Newcastle Police Department and the Chickasaw Lighthorse Police Department (LHPD) responded to a residence in Newcastle, Oklahoma for a burglary. The residents (VI-2) had multiple surveillance cameras that captured the suspect at their residence. NPD Officer Slentz responded to the residence, approaching from the west. Approximately two houses to the west of the victims' residence, Officer Slentz saw a white male wearing red shorts, a plaid shirt, and black-rimmed glasses hiding behind a tree. Officer Slentz exited his patrol vehicle and ordered the male to show his hands. The suspect fled on foot, jumped into and swam across a pond, and entered a wooded area. A camouflage sweatshirt, a pair of gloves, a pocketknife, a garage door opener, loose change, and the victims' ammo can (see below) were found discarded near a residence approximately two-to-three doors west of the

3

victims.[1] The pocketknife, gloves, garage door opener, and loose change were all found in a black plastic bag.

11. Surveillance videos show the suspect tampering with VI-2's vehicles (a personal victim and an Oklahoma Department of Corrections issued patrol vehicle), seemingly flattening the tires by puncturing them with a pocketknife (multiple tires were, in fact, punctured and flattened). Videos captured of the rear of the property indicate the suspect opened VI-2's shed and then show the suspect carrying an ammo can that was previously in the shed. Videos of the front of the property also captured a white Ford Excursion driving through the neighborhood.

12. The LHPD Officer Cash responded to the scene to assist and learned the suspect had fled on foot. Officer Cash learned the suspect was a white male that had long hair, black glasses, camouflaged jacket or sweatshirt, red shorts, and brown shoes.

13. While Officer Cash was holding the scene, and other officers were searching for the burglary suspect, Officer Cash saw a white Ford Excursion pass that bore a Cherokee Nation tag. Officer Cash saw the driver of the vehicle, a female, who appeared to be looking for someone. VI-2's residence is in the Western District of Oklahoma and within the boundaries of the Chickasaw Nation.

14. On August 22, 2025, at around 0049 hours, Officer Cash responded to a burglary at a residence in Washington, Oklahoma. This residence is located in the Western

---

[1] Surveillance videos show the suspect initially wore dark pants, gloves, a camouflage jacket or sweatshirt, distinctive shoes, and dark-rimmed glasses.

4

District of Oklahoma and within the boundaries of the Chickasaw Nation. The suspect of this burglary had taken a Smith & Wesson M&P firearm, with tape around the grip, from one of the resident's (VI-3) vehicles; and then fled the scene on foot. When Officer Cash arrived, he observed a white Ford Excursion parked down the road, bearing Cherokee Nation tag AK4014. Officers requested a records check on the vehicle and were advised the vehicle was registered to AUSTIN GARRETT **REEVES**. Officer Cash observed evidence, brown shoes, he believed were related to the above-described Newcastle burglary tied to the back door of the Ford Excursion.

15. LHPD Officers and the McClain County Sheriff's Office began searching the area and subsequently located **REEVES** hiding underneath a deck of a nearby residence. **REEVES** had the keys to the Ford Excursion in his pocket. **REEVES** was detained and subsequently arrested for the burglary and other criminal charges. During the arrest, officers learned **REEVES** is a member of the Cherokee Nation.

16. Officer Cash determined the Ford Excursion would need to be impounded. A wrecker was called and Officer Cash inventoried the Excursion. During the inventory of the Excursion, Officer Cash located VI-3's stolen firearm. VI-3 positively identified the firearm and it was returned to him. **REEVES** was taken to jail.

17. On August 22, 2025, at around 1700 hours, **REEVES** was released from jail.

18. On August 23, 2025, at around 0221 hours, VI-3 called 911 to report someone just set his cars on fire at his residence. The fire quickly spread from VI-3's vehicles to the home and destroyed all three vehicles and the home—his vehicle, his wife's

vehicle, and his McClain County Sheriff's patrol vehicle. VI-3 and his family were able to escape the home unharmed.

19. Video surveillance, collected from VI-3's home, depicted someone running up to their vehicles, pouring a liquid onto the vehicles, and setting them on fire. This person then ran away and appeared to also be on fire on the left side of their body.

20. Video surveillance, collected from the nearby school, revealed a blue car arrive and park at the school. A person exited the vehicle and began walking in the direction of VI-3's home. At one point in the video, it appeared the person was carrying a five-gallon gasoline can on their shoulder, was wearing shorts, and work boots.

21. Early in this investigation, law enforcement learned **REEVES** was released from jail. Therefore, law enforcement began conducting surveillance on his known residence, located at 710 Flaming Oaks Drive, Norman, Cleveland County, Oklahoma.

22. During surveillance, law enforcement observed a blue car parked in **REEVES'** driveway. Later, as described below, it was learned this blue car was a 2021, four-door Hyundai Elantra, bearing Oklahoma tag number IRA-120 and VIN: 5NPLM4AG8MH000440. This Hyundai Elantra appeared to be the same make, model, and color as the blue car seen in the video surveillance collected from the school.

23. During the surveillance of **REEVES'** home, law enforcement observed a white GMC Yukon leave the residence. A traffic stop was made on the vehicle and the driver was identified as K.R. According to K.R., her mother was dating **REEVES'** father. K.R. told the police officer that **REEVES** was at the house and since his white Ford

Excursion was in impound (due to his burglary arrest), **REEVES** would be driving the blue Hyundai Elantra parked in the driveway.

24. On August 23, 2025, at around 0546 hours, the Chickasaw Nation issued an arrest warrant for **REEVES**, charging him for multiple counts of: Possession of Stolen Property, Larceny, Burglary in the Second Degree; and Possession of Firearm by Prohibited Possessor.

25. On August 23, 2025, your Affiant applied for an obtained a state search warrant to search **REEVES'** home at 710 Flaming Oaks Drive, Norman, Cleveland County, Oklahoma. Your Affiant obtained the search warrant to search the residence for **REEVES**, to serve the Chickasaw Nation arrest warrant.

26. On August 23, 2025, multiple law enforcement agencies served the search warrant and subsequently arrested **REEVES** for the warrant. When **REEVES** was arrested, he had a significant burn on the left side of his abdomen.

27. On August 23, 2025, your Affiant applied for and received a second state search warrant for **REEVES'** home. The purpose of this second search warrant was to search for evidence of arson.

28. During the search of the residence, your Affiant located a pair of brown leather work boots in the entryway of the residence. These work boots had a strong odor of gasoline. The key to the blue 2021 Hyundai Elantra was found in a room, which contained items of dominion and control indicating the room was occupied by **REEVES**. Next to the blue 2021 Hyundai Elantra key, your Affiant located a pink Bic Lighter. Your

Affiant also located and collected items which were reported missing from VI-1's vehicle burglary.

29. A search of the blue 2021 Hyundai Elantra revealed the VIN (vehicle identification number) was 5NPLM4AG8MH000440. Your Affiant located a black wallet, inside of the car, which contained **REEVES'** drivers license, debit card, Cherokee Nation member cards, and other items. Your Affiant opened the trunk of the vehicle and smelled a strong odor of gasoline.

30. On August 26, 2025, your Affiant obtained and sent a Federal Grand Jury subpoena to Hyundai Motor America. Your Affiant was seeking the IMEI and/or the IMSI of the 2021 Hyundai Elantra bearing VIN:5NPLM4AG8MH000440.

31. On October 24, 2025, Hyundai Motor America responded to the subpoena. Your Affiant reviewed the information and found the IMEI of the 2021 Hyundai Elantra bearing VIN:5NPLM4AG8MH000440 was 352756079862042 and the vehicle's Mobile Directory Number (MDN) was (657) 437-0711. Hyundai Motor America also noted that this vehicle was "deprovisioned" on August 6, 2024, at 2007 hours. **NOTE:** using an open-source database, your Affiant learned "deprovisioned" means the process of removing a user's access rights and permissions to systems, applications, and data. As stated below, in paragraph 34, the users of this vehicle may not even know the vehicle is communicating with the Verizon network.

## "CONNECTED VEHICLES"

32. Your Affiant knows that many newer model cars are equipped to communicate with the cellular networks of major providers. This communication occurs

through a cellular device installed by the manufacturer at the time of manufacturing and allows the vehicle to operate as a "Wi-Fi hotspot" and allows users to make/receive voice calls and send/receive SMS (text) message through the vehicle's cellular connection. Data connections over the cellular network allow the manufacturer to send software updates to the vehicle and monitor vehicle performance. The cellular device, which operates like a cellular phone, is assigned an "International Mobile Equipment Identity" (IMEI), which is analogous to the serial number of a cellular phone. It is also assigned an "International Mobile Subscriber Identity" (IMSI), which, like a cellular phone, identifies a specific subscriber on a carrier's network. It is also assigned a "Mobile Station Integrated Services Digital Network" (MSISDN) or a Mobile Directory Number (MDN), which is a phone number used to also identify the vehicle on the cellular network.

33. Because the device operates like a cellular phone on a provider's network, the records, information and services sought by your Affiant for the aforementioned vehicle are maintained in the course of regular business by the cellular provider in the same fashion as they keep cellular records for a cellular subscriber. Your Affiant has learned, utilizing Leads Online Toolbox, and their Connected Cars feature, that Verizon services Hyundai vehicles. In order for Verizon to search their records, for the requested data, they require the IMEI and/or IMSI assigned to the vehicle.

34. Connected vehicles can provide the driver and/or passengers with enriched experiences. A connected vehicle may have its own connection to the internet that allows the vehicle to share internet access and data with other devices inside and outside the vehicle (Wi-Fi). A connected vehicle's navigation system may have a traffic monitoring

feature that can alert you if there is an accident on your route and offer alternative routes. A user may be able to use a smartphone app to start the vehicle's engine, lock/unlock doors, and/or flashlights or honk the horn if the vehicle can't be located in a parking lot for example. Some connected vehicles offer concierge services that allow for communication with a customer service representative of 3rd party companies like OnStar to get information and/or directions.

35. Furthermore, your Affiant has learned from training, experience, and consultation with other investigators that many manufacturers establish data plans with AT&T or other cellular providers, such as Verizon, as the vehicles roll off the assembly line and/or immediately after purchase in order to continually send updates to the vehicle. In many instances, the users of the vehicle may not even know the data connectivity between the vehicle and cellular providers exists. For the enriched user experiences referenced above, some users may establish data connectivity plans with AT&T, Verizon, or other cellular providers and pay for them on a monthly basis as well. Essentially, it is feasible that the vehicle in this matter is communicating with the Verizon network even if the vehicle's user does not pay for a data usage plan.

36. Your Affiant has queried the list of connected vehicles and confirmed the year, make, and model of the vehicle, in this case, is capable of having data connection compatibility with the listed Verizon. Your Affiant believes that the data records related to the vehicle (Described in ATTACHMENT B) are necessary and relevant to the investigation.

**VERIZON**

37. In my training and experience, I have learned that Verizon is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be ten or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

38. Based on my training and experience, I know that Verizon can collect cell-site data about the **SUBJECT ACCOUNT**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Verizon typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

11

39. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").

40. Based on my training and experience, I know wireless providers such as Verizon typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service

41. I am aware cellular service providers maintain historical location records consisting of engineering data. This historical location data is referred to "Timing Advanced" or Round-Trip Time (RTT) records. Timing Advanced records refers to records the service provider, Verizon, collects and uses as engineering data. Service providers, such as Verizon, measure the time it takes for a signal to travel from the cellular tower, to a device, and back to the cellular tower. By measuring this signal, the provider can estimate the distance and direction of the mobile device to the cell tower site and therefore estimate the location of the device.

42. These historical records estimate the target phone's location, and/or the distance and direction from the cell site. Utilizing these historical location records can provide investigators with a much smaller footprint of a device's location before, during, and after a crime. These records have assisted your Affiant to learn where suspects and victims come from before the crime, where suspects and victims are during the crime, and their movements post-crime. Additionally, these records have also assisted your Affiant in locating the victim of a homicide, that was killed at one place and dumped somewhere else.

## AUTHORIZATION REQUEST

43. Based on the foregoing, I request that this Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.

44. I further request that the Court direct Verizon to disclose to the government any information described in Attachment B that is within its possession, custody, or control. Because the warrant will be served on Verizon, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

_David Gatlin_
David Gatlin, Lieutenant
Oklahoma Bureau of Investigation

Subscribed and sworn to before me on _October 31_, 2025

_Amanda L. Maxfield_
AMANDA L. MAXFIELD
UNITED STATES MAGISTRATE JUDGE

13

## ATTACHMENT A

### Property to Be Searched

1. The device assigned IMEI 352756079862042 and/or Mobile Directory Number (MDN) (657) 437-0711 (the "**SUBJECT ACCOUNT**") whose wireless service provider is Verizon (the "Provider"), a company that accepts process at 180 Washington Valley Road, Bedminster, NJ.

2. Records and information associated with the **SUBJECT ACCOUNT** that is within the possession, custody, or control of Verizon.

## ATTACHMENT B

### Particular Things to Be Seized

I. **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the **SUBJECT ACCOUNT** listed in Attachment A:

    a. The following information about the customers or subscribers associated with the **SUBJECT ACCOUNT** for the time period August 22, 2025, through August 23, 2025:

        I. Provide subscriber information for the **SUBJECT ACCOUNT**, including name, address, telephone number, the inception of service, source of payment for service, and associated telephone numbers.

    b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **SUBJECT ACCOUNT**, including:

        i. Data records for the **SUBJECT ACCOUNT**, to include cell tower site/sector information between the dates of August 22, 2025, through August 23, 2025.

      ii.    Historical location information commonly referred to as Timing Advance records or RTT data for the **SUBJECT ACCOUNT** between the dates of August 22, 2025, through August 23, 2025.

## II. Information to Be Seized by the Government

The information described in Section I would assist and aid your Affiant in learning the locations of the blue 2021, four-door Hyundai Elantra, bearing Oklahoma tag number IRA-120, VIN: 5NPLM4AG8MH000440, IMEI: 352756079862042, and MDN (657) 437-0711 before, during, and after the above-described Arson in Indian County crime committed on or about August 23, 2025.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by Verizon in order to locate the things particularly described in this Warrant.